UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
TEXARKANA DIVISION

DELRAE MCKENZY SMITH                                                                PLAINTIFF

v.                                      Civil No. 4:14-CV-04126-SOH-BAB

LIEUTENANT ADAMS, WARDEN                                          DEFENDANTS
BRAZELL, NURSE EMERSON, and
MILLER COUNTY

## REPORT AND RECOMMENDATION

This is a civil rights action filed by Plaintiff, Delrae McKenzy Smith, pursuant to the

provisions of 42 U.S.C. § 1983.  Plaintiff proceeds *pro se* and *in forma pauperis*.  Pursuant to the

provisions of 28 U.S.C. § 636(b)(1) and (3)(2011), the Honorable Susan O. Hickey, United States

District Judge, referred this case to the undersigned for the purpose of making a Report and

Recommendation.

Currently before the Court are a Motion for Summary Judgment by the Miller County

Defendants (Lieutenant Adams and Warden Brazell) (ECF No. 37), and by Defendant Nurse

Emerson.  ECF No. 34.  A hearing was held on September 15, 2016, to allow the Plaintiff to give

a sworn oral statement in response to the Motion.[1]  ECF No. 44.  After careful consideration of the

briefing and sworn statement of the Plaintiff, the undersigned makes the following Report and

Recommendation.

## 1.    BACKGROUND

Plaintiff is currently incarcerated in the Arkansas Department of Correction ("ADC")

Varner Unit.  The events that are the subject of this lawsuit occurred while Plaintiff was

---

[1] As this was a sworn oral response to a Motion for Summary Judgment the Court did not allow
cross examination of Plaintiff.

incarcerated in the Miller County Correctional Center (MCDC).  ECF No. 1.  Plaintiff filed this Complaint on September 25, 2014.  ECF No. 1.  In his Complaint, Plaintiff alleges his constitutional rights were violated when both of his hands were broken during his arrest on December 12, 2013, and Nurse Bruce and Nurse Emerson denied him medical care for them.  ECF 1, p. 10-11.  He also alleges his constitutional rights were violated when he was placed in isolation and made to wear ankle restraints in the shower and on recreation time, and further was only allowed one hour of recreation every seventy-two (72) hours.  Plaintiff brought this action against all Defendants in both their official and personal capacities.  ECF. No. 1, pp. 4-6.  Plaintiff requests compensatory, punitive, and "mental anguish" damages.  ECF No. 1, pp. 9-12.

Nurse Bruce and Nurse Emerson filed a Motion to Dismiss on March 30, 2015, requesting the official capacity claims against them be dismissed for failure to state a claim.  ECF No. 11.  A Report and Recommendation was filed on February 16, 2016, recommending the official capacity claims against Nurses Bruce and Emerson be dismissed with prejudice, but that the personal capacity claims remain.  ECF No. 28.  Plaintiff objected, requesting that the official capacity claims be dismissed without prejudice so that the dismissal would not count as a PLRA strike against him. ECF No. 29.  This Report and Recommendation was adopted on March 10, 2016, dismissing the official capacity claims without prejudice.  ECF No. 33.

Nurse Bruce and Nurse Emerson filed their Motion for Summary Judgment on July 14, 2016.  ECF No. 34.  The Miller County Defendants filed their Motion for Summary Judgment on August 1, 2016.  ECF No. 37.

Plaintiff filed a written response with exhibits on September 12, 2016.  ECF No. 41.

Plaintiff appeared by videoconference and gave a sworn statement in response to the

Summary Judgment Motion on September 15, 2016.  ECF No. 44.  At this hearing, Plaintiff made an oral motion to dismiss Nurse Bruce as a Defendant in this case.  A Report and Recommendation to this effect was filed the same day, and adopted on October 12, 2016.  ECF Nos. 45, 46.  During his testimony, Plaintiff also attempted to introduce claims concerning a loss of hearing, his placement in lockdown for "months at a time," and his failure to receive pain medication while in lockdown.  The Court explained the only claims he could address at the hearing were those in his Complaint.  Plaintiff also asked to file witness affidavits, such as from Dr. Perry, the mental health counselor at MCDC.  The Court gave Plaintiff thirty days from the date of the hearing to file these additional documents.  Defendants then requested additional time to respond to any documents filed.  The Court granted Defendants fourteen days to respond to any such documents.  Plaintiff did not file any additional documents.

Plaintiff's testimony was as follows.  Regarding his claims against Nurse Emerson, Plaintiff testified he injured his fingers, describing the injury as ripped tendons.[2]  He wrote a sick call, and the response to the sick call told him to stop punching video receivers.  Plaintiff testified he slammed the phone receiver in the barracks, resulting in a bleeding hand.  It was two days before he saw the nurse for his hand.  He was still bleeding two days later.  He saw Nurse Emerson two days later in the nurses' station.  She told him it was too late to get stitches because it had already started to heal.  She told him to go to the commissary and purchase pain medication.  Plaintiff had no other complaints against Nurse Emerson.

Plaintiff did not purchase any pain medication because he was on lockdown and was not

---

[2] In his written response, Plaintiff provided more detail and context for this incident.  He stated he injured his right hand by "slamming a phone receiver on the hook.  The receiver shattered and cut through two of my fingers all the way to the bone, that's why it stated on sick-call 'stop punching video receivers.'"  ECF No. 41, p. 4.

permitted to go to the commissary.  He could not get pain medication or anything else from the commissary during that time frame.  Plaintiff was asked if he was ever able to go to the commissary to get pain medication.  Plaintiff further testified he was never able to get pain medication from the commissary.  Plaintiff received ibuprofen from Nurse Bruce at a later time.

Plaintiff confirmed that no medical professional, such as a doctor or nurse, had ever told him that he had any permanent injury as a result of lack of treatment for his hands.  Plaintiff testified "he never really talked to the nurses here about it."  Plaintiff still receives pain medication for his hands.  Plaintiff referenced Plaintiff's Exhibit A, a note from Nurse Brown dated December 13, 2013, the day after he was booked into the facility.  ECF No. 41-1, p. 1.  This note states Nurse Brown was approached by Plaintiff, who stated he had filled out a sheet to see her the prior night because both his hands were broken and he was supposed to have surgery.  Nurse Brown noted he had been booked into the facility the night before, on December 12, 2013.  Nurse Brown noted an obvious deformity in the right hand and swelling.  Nurse Brown noted Plaintiff complained of pain.  Nurse Brown further noted a scar from previous surgery on his left hand, as well as some swelling.  Plaintiff was not currently taking any medication.  Nurse Brown ordered x-rays for both hands, as well as 600 mg of ibuprofen twice a day for five days.  Nurse Brown spoke with the x-ray technician, who indicated she would be at the facility that day.

Plaintiff also referenced his Exhibit B.  ECF No 41-1, p. 2.  This is an inmate sick call dated February 4, 2014.[3]  Plaintiff's copy of the sick call is difficult to read due to poor copy quality.  However, it was also submitted by Defendants as Exhibit 2a-5.  ECF No. 35-2, p. 8.  In

---

[3] The dates on this sick call could be read as either February 4, 2014, or February 9, 2014. However, based on other documents in the record, including the affidavit of Nurse Bruce (ECF No. 35-2, p. 2), the sick call will be interpreted as being dated on February 4, 2016.

this sick call, Plaintiff states, among other issues, that his hands are broken. He indicates this has been an ongoing issue. The response states: "Stop punching video receivers. Get pain meds, Tylenol and Motrin, from commissary." The sick call does not indicate who wrote the response.

Plaintiff further testified the nursing staff told him he would have arthritis from the fractures in his hand.

The Court noted Defendants had produced evidence showing that both of Plaintiff's hands had been broken long before his arrest, and asked Plaintiff to respond to these submissions. Plaintiff testified that his right hand had been broken prior to his arrest, but his left hand was broken when he was arrested. He testified he was arrested several days earlier and placed in the Bi-State facility before coming to MCDC.

Plaintiff testified Lieutenant Adams had administered cruel and unusual punishment against him. He stated Adams issued the order to put Plaintiff in lockdown and keep him in full restraints when out of the cell. Plaintiff was required to wear leg shackles even when showering, and could not get fully undressed to do so. This resulted in cuts and bruises around his ankles. Adams told Plaintiff this action was legal because it was a security matter. Plaintiff denied any injuries other than cuts and bruises on his ankles.

Plaintiff further testified Adams put him in lockdown in a cell. He stated he was kept there for six days, and the cell was poorly ventilated. He asked for photos of the cell and did not receive them. Plaintiff testified Adams told him there was no other way to punish him for his behavior. Plaintiff testified the behavior MCDC was punishing consisted of "verbal altercations with inmates and breaking the phone."

Plaintiff testified he did not have any direct contact with Warden Brazell regarding any of

his complaints.   He further stated Adams was under Brazell's supervision.   Plaintiff wrote

grievances and Brazell never responded.

Plaintiff confirmed that he was booked into MCDC on December 12, 2013, and then placed

in lockdown on February 22, 2014.  Plaintiff testified he was able to go to the commissary for the

two months between his booking and lockdown to purchase pain medication, but had no funds to

purchase anything.

## 2.      LEGAL STANDARD

The Court "shall grant summary judgment if the movant shows that there is no genuine

dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R.

Civ. P. 56(a).  "[A] genuine issue of material fact exists if: (1) there is a dispute of fact; (2) the

disputed fact is material to the outcome of the case; and (3) the dispute is genuine, that is, a

reasonable jury could return a verdict for either party."  *RSBI Aerospace, Inc. v. Affiliated FM Ins.

Co.,* 49 F.3d 399, 401 (8th Cir. 1995).  The moving party has the burden of showing the absence

of a genuine issue of material fact and that they are entitled to judgment as a matter of law, but the

nonmoving party may not rest upon mere denials or allegations in the pleadings and must set forth

specific facts to raise a genuine issue for trial.  *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242,

256 (1986); *Celotex Corp. v. Catrett,* 477 U.S. 317, 324 (1986).  The Court must view all evidence

and inferences in a light most favorable to the nonmoving party.  *See McCleary v. ReliaStar Life

Ins. Co.,* 682 F.3d 1116, 1119 (8th Cir. 2012).  However, "[w]hen opposing parties tell two

different stories, one of which is blatantly contradicted by the record, so that no reasonable jury

could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion

for summary judgment."  *Scott v. Harris*, 550 U.S. 372, 380 (2007).

## 3.    DISCUSSION

The Miller County Defendant argue summary judgment is appropriate in their favor based on the following grounds:   (1) Defendant are entitled to qualified immunity because no constitutional violations occurred; (2) Plaintiff has failed to present any evidence to corroborate his conditions of confinement claims to show that any of the Miller County Defendants were deliberately indifferent to his health and safety, to show that he was actually denied the minimal civilized measure of life's necessities, or to show he suffered any actual harm from the alleged conditions of confinement; (3) Plaintiff's allegations of denial or delay of medical care fail as a matter of law because he has provided no proof that he was denied medical care or that he suffered any objectively verifiable injury as a result of a delay or denial of medical care; (4) Plaintiff suffered no actual physical injury and therefore cannot pursue compensatory damages; and (5) Plaintiff made no allegations which could support a claim for official capacity liability.  ECF No. 38, pp. 2-12.

Nurse Emerson argues summary judgment is appropriate in her favor based on the following grounds: (1) she was not deliberately indifferent to Plaintiff's medical needs; (2) there is no proof Plaintiff suffered from a serious medical need; and (3) Plaintiff cannot meet proof with proof, and she is entitled to summary judgment as a matter of law.  ECF No. 35, pp. 5-11.

### A.    Official Capacity Claims

The Miller County Defendants correctly argue Plaintiff failed to provide any summary judgment evidence which could support an official capacity claim.  Under Section 1983, a defendant may be sued in either his individual capacity, or in his official capacity, or in both.  In

*Gorman v. Bartch,* the Eighth Circuit Court of Appeals ("Eighth Circuit") discussed the distinction

between individual and official capacity suits. As explained by the *Gorman* case:

> Claims against government actors in their individual capacities differ from those in
> their official capacities as to the type of conduct that is actionable and as to the type
> of defense that is available. *See Hafer v. Melo,* 502 U.S. 21, 112 S.Ct. 358, 116
> L.Ed.2d 301 (1991). Claims against individuals in their official capacities are
> equivalent to claims against the entity for which they work; they require proof that
> a policy or custom of the entity violated the plaintiff's rights, and the only type of
> immunity available is one belonging to the entity itself. *Id.* 502 U.S. at 24–27, 112
> S.Ct. at 361–62 (1991). Personal capacity claims, on the other hand, are those
> which allege personal liability for individual actions by officials in the course of
> their duties; these claims do not require proof of any policy and qualified immunity
> may be raised as a defense. *Id.* 502 U.S. at 25–27, 112 S.Ct. at 362.

*Gorman,* 152 F.3d 907, 914 (8th Cir. 1998). "[R]igorous standards of culpability and causation

must be applied to ensure that the [county] is not held liable solely for the actions of its employee"

in cases where a plaintiff claims a county has caused an employee to violate the plaintiff's

constitutional rights. *Board of County Commissioners, Oklahoma v. Brown,* 520 U.S. 397, 405

(1997).

Plaintiff failed to provide any summary judgment evidence which could support an official

capacity claim. Plaintiff failed to make any allegations or state any facts which indicated Miller

County had any custom or policy which violated his constitutional rights. There are therefore no

material facts in dispute concerning an official capacity claim against Miller County, and Miller

County is entitled to summary judgment on this claim as a matter of law.

**B.     Warden Brazell**

Plaintiff failed to provide any facts or allegations that Warden Brazell was personally

involved in, or directly responsible for, any of Plaintiff's alleged constitutional violations. A claim

of deprivation of a constitutional right cannot be based on a *respondeat superior* theory of liability.

8

*See Monell v. Department of Social Services,* 436 U.S. 654, 694 (1978). "[A] supervisor is not vicariously liable under 42 U.S.C. § 1983 for an employee's unconstitutional activity." *White v. Holmes,* 21 F.3d 277, 280 (8th Cir. 1994); *see also Keeper*, 130 F.3d at 1314 ("general responsibility for supervising the operations of a prison is insufficient to establish the personal involvement required to support liability"). "Liability under section 1983 requires a causal link to, and direct responsibility for, the deprivation of rights. To establish personal liability of the supervisory defendants, [Plaintiff] must allege specific facts of personal involvement in, or direct responsibility for, a deprivation of his constitutional rights." *Clemmons v. Armontrout,* 477 F.3d 962, 967 (8th Cir. 2007) (quoting *Mayorga v. Missouri,* 442 F.3d 1128, 1132 (8th Cir. 2006)). In other words, Warden Brazell cannot be held liable merely because he holds a supervisory position at MCDC.

Plaintiff's claims against Warden Brazell are based solely on his supervisory position as Warden. Plaintiff testified he did not have any direct contact with Warden Brazell concerning the claims in his Complaint, but was suing him because Defendant Adams was under his supervision. Plaintiff alleged Warden Brazell also did not answer grievances. Defendants provided a copy of a grievance by Plaintiff dated January 19, 2014. It was answered by Warden Brazell on January 22, 2014. ECF No. 35-1, p. 3. Plaintiff clearly sued Warden Brazell because he was the Warden and, as such, was Adams' supervisor, which is a *respondeat superior* claim.

Plaintiff therefore failed to provide any facts or allegations that Warden Brazell was personally involved in, or directly responsible for, any of Plaintiff's alleged constitutional violations. There are therefore no material facts in dispute concerning Warden Brazell's liability in this case, and Warden Brazell is entitled to summary judgment as a matter of law.

### C.   Lieutenant Adams

Plaintiff's claims against Lieutenant Adams in his Complaint are limited to cruel and unusual punishment for placing him in lockdown for six days on February 22, 2014, limiting his recreation to one hour per day, and requiring him to wear full restraints, even while showering. Plaintiff testified he was told this was his punishment for "verbal altercations with inmates and breaking the phone," and that there was no other way to punish him.  He further testified he was told this was a security issue.  He testified the shackles gave him bruises and cuts on his ankles. In his written summary judgment response, he stated Defendant Adams was so upset with him for breaking the phone that he refused to allow him treatment, placing him in the cell with just a towel for his hand.  ECF No. 41, p. 4.

The Miller County Defendants argue Plaintiff provided no proof regarding any of his conditions of confinement allegations.  Specifically, they argue he failed to provide any evidence that his allegations concerning leg irons and recreation time actually occurred, that any Miller County Defendant knew of and disregarded any excessive risk to his health and safety, that he was actually denied any minimal civilized measure of life's necessities, or that he was actually harmed by any alleged conditions. ECF No. 38, pp. 2-4.  They further argue he did not allege he could not exercise in his cell, or that he suffered any muscle atrophy or threat to his health based on a lack of recreation time.  ECF No. 38, p. 5.

Plaintiff testified he was placed in lockdown on February 22, 2014.  He failed, however to provide any evidence that he was actually placed in lockdown on February 22, 2014.   Both Defendants provided portions of Plaintiff's jail file.  None of the submissions showed he was placed in lockdown for breaking the phone or any other reason on February 22, 2014.   The

submissions by Nurse Emerson, however, showed disciplinary reports and disciplinary committee findings against Plaintiff for physical fights with other inmates in March and July of 2014.  ECF No. 35-1, pp. 5-12.

It appears there is a disputed fact issue as to whether Plaintiff was placed in lockdown on February 22, 2014.  Such dispute is not material.  Even if we accept Plaintiff's allegations that he was placed in lockup on February 22, 2014 as true, Plaintiff did not provide any summary judgment evidence of injuries to his ankles from wearing shackles or health issues due to lack of recreation. There is no evidence in the record of sick call for injuries to his ankles from being forced to shower wearing leg irons or for any health issues due to lack of recreation.  In contrast, Defendants provided Plaintiff's jail file, including his sick calls.  His sick calls were as follows:  a mental health request (ECF No. 39-3, p. 22); heartburn, dry skin, and his feet "breaking out" (ECF No. 39-3, p. 6); a request to change when his medications were delivered (ECF No. 39-3, p. 16); for razor rash, which he characterized as an "emergency" because his face felt like it was on fire (ECF No. 39-3, p. 17); and for losing weight, loss of energy, and pain in his hands.  ECF No. 35-2, p. 8. A medical record several months later, in October 2014, notes a neoplasm in Plaintiff's ear.  ECF No. 39-3, p. 10.  Plaintiff clearly knew how to place a sick call for his medical needs and did not hesitate to do so.  None of the sick calls or medical records mentioned injuries to his ankles or health issues due to lack of recreation or any restraint.  As discussed below in the section concerning Nurse Emerson, medical records were provided to show extensive medical attention for his hands at various times, including the February 2014 incident when he broke the phone/video receiver.  Plaintiff also admitted to destroying jail property and engaging in verbal altercations with other inmates in both his written summary judgment response (ECF No. 41, p. 4), and his

11

oral testimony. He further testified he was told his lockdown and restraints were a matter of prison security and there was no other way to punish him for his behavior.

It is not the role of this Court to second-guess the judgment of prison administrators on issues of prison management unless a facially valid constitutional claim is raised. *Iron Eyes v. Henry*, 907 F.2d 810, 812 (8th Cir. 1990) (citing *Bell v. Wolfish*, 441 U.S. 520, 545 (1979). Plaintiff has provided no summary judgment allegations or facts to support a facially valid constitutional claim for either conditions of confinement or denial of medical care against Defendant Adams. There are therefore no material facts in dispute concerning Lieutenant Adams' liability in this case, and Lieutenant Adams is entitled to summary judgment as a matter of law.

### D.      Nurse Emerson

Nurse Emerson correctly argues Plaintiff was not denied appropriate and timely medical care for his hands and further failed to show that he suffered any serious medical need for his hands. Plaintiff's allegations concerning his alleged denial of medical care for his hands are both internally inconsistent and blatantly contradicted by the record as to both the objective and subjective prongs of the deliberate indifference test.

The Eighth Amendment prohibition of cruel and unusual punishment prohibits deliberate indifference to prisoners' serious medical needs. *Luckert v. Dodge County*, 684 F.3d 808, 817 (8th Cir. 2012). To prevail on his Eighth Amendment claim, Plaintiff must prove that Defendants acted with deliberate indifference to his serious medical needs. *Estelle v. Gamble,* 429 U.S. 97, 106 (1976).

The deliberate indifference standard includes "both an objective and a subjective component: 'The [Plaintiff] must demonstrate (1) that [he] suffered [from] objectively serious

12

medical needs and (2) that the prison officials actually knew of but deliberately disregarded those needs.'" *Jolly v. Knudsen,* 205 F.3d 1094, 1096 (8th Cir. 2000) (quoting *Dulany v. Carnahan,* 132 F.3d 1234, 1239 (8th Cir. 1997)).

To show that he suffered from an objectively serious medical need Plaintiff must show he "has been diagnosed by a physician as requiring treatment" or has an injury "that is so obvious that even a layperson would easily recognize the necessity for a doctor's attention." *Schaub v. VonWald*, 638 F.3d 905, 914 (8th Cir. 2011) (internal quotations and citations omitted).

For the subjective prong of deliberate indifference, "the prisoner must show more than negligence, more even than gross negligence, and mere disagreement with treatment decisions does not give rise to the level of a constitutional violation. Deliberate indifference is akin to criminal recklessness, which demands more than negligent misconduct." *Popoalii v. Correctional Med. Servs,* 512 F.3d 488, 499 (8th Cir. 2008) (internal quotation marks and citations omitted).

Plaintiff's allegations concerning which hand was broken during his arrest are internally inconsistent. Plaintiff's Complaint alleges both his hands were broken "due to the result of my arrest." ECF No. 1, p. 10. At his hearing, Plaintiff testified it was only his left hand which was broken during the arrest. Plaintiff's testimony concerning his ability to access the commissary for pain medication is also internally inconsistent. Early in the hearing, Plaintiff testified he was never able to go to the commissary and get pain medication because he was in lockdown. Later in the hearing, Plaintiff confirmed he was not placed in lockdown until February 22, 2014, approximately two months after he was booked. At the end of the hearing, Plaintiff testified he was able to go to the commissary for the two months prior to lockdown, but did not have the funds to purchase anything.

Plaintiff alleged he did not receive treatment for his broken hands on two different occasions. The first occasion was in December 2013 immediately after his arrest. The second was when he hurt his hand breaking a jail phone/video receiver. However, Plaintiff's own Exhibit A, the examination record from Nurse Brown, as well as the medical record as a whole, contradicts this allegation. Nurse Brown examined Plaintiff on December 13, 2013, the day after he was booked into MCDC. Nurse Brown noted swelling on both hands and an old surgery scar on the left hand. She ordered x-rays to be taken that day, and 600 mg of ibuprofen twice a day for five days. ECF No. 41-1, p. 1. According to the affidavit of former Defendant Nurse Bruce, Plaintiff was also prescribed ice packs as needed. The x-ray reports submitted by Defendants were dated December 13, 2013. The x-ray report for Plaintiff's left hand indicated a healing fracture with a plate and screw fixation in the distal radius. ECF No. 35-2, p. 4. The x-ray report for his right hand indicated "old healed fractures." ECF No. 35-2, p. 5. Medical records from Plaintiff's file indicate he also received x-rays of his right hand on February 4, 2014, and both hands on September 13, 2014. No new fractures were noted in any of the x-ray reports submitted. ECF No. 35-2, pp. 4-5, 9, 10-11. He was prescribed 600 mg of ibuprofen for five days on December 13, 2013, as well as ice packs. On December 18, 2013, he also received prescriptions for two antibiotics and an antibacterial drug. ECF No. 35-2, p. 12. On September 18, 2014, Plaintiff began receiving Mobic for arthritis pain. ECF No. 35-2, p. 12.

Plaintiff alleged he did not receive any pain medication for his hands, instead being told to get it from the commissary. He first testified at his hearing the he was in lockdown and was not able to go to the commissary to get pain medication. Later in the same hearing, Plaintiff testified he was booked into MCDC on December 12, 2013, and first put in lockdown on February 22, 2014. He testified he was able to go to the commissary, but did not have funds to purchase pain

14

medication.  As discussed above, Plaintiff received medical treatment, including pain medication and ice packs for his hands starting the day after he was booked into MCDC, in February 2014, and again in September 2014.  As discussed below, Plaintiff was able to make purchases at the commissary when he was not in lockdown, but did not purchase pain medication.  There is no material issue of fact that Plaintiff received medical treatment, including medication, from the day he was booked into the MCDC.

Based on his testimony, Plaintiff's allegation against Nurse Emerson for denial of medical care centers on the injury he inflicted upon himself when he broke a phone/video receiver approximately two months after his incarceration at MCDC.  His sick call slip dated February 4, 2014, states his hands are broken, among other issues.  He states this is an ongoing issue.  The response states: "Stop punching video receivers.  Get pain meds, Tylenol and Motrin, from commissary."  ECF No. 35-2, p. 8.  An x-ray report of Plaintiff's right hand dated February 4, 2014, states no gross abnormalities, fractures, or dislocations seen.  ECF No. 35-2, p. 9.  Based on the affidavit from former Defendant Nurse Bruce, Plaintiff made no complaints of pain in his hands from the early February 2014 sick call until September 2014.  ECF No. 35-2, p. 2.  Finally, Plaintiff was able to access and purchase items from the commissary prior to his alleged lockdown on February 22, 2014.  Defendants submitted a commissary receipt dated February 18, 2014 and signed by Plaintiff.  This receipt indicates Plaintiff spent $48.02 for the following items: eight bags of spicy chicken noodles, six bags of beef noodles, one pack of sugar free hard candy, two coffee bags, four bags of jalapeno Cheetos, four bags of Fritos BBQ chips, four bags of Fritos Chili Cheese Chips, and one pack of AAA batteries.  ECF No. 35-1, p. 4.  Plaintiff purchased no pain medication.  Plaintiff had a balance of $19.06 available after his shopping trip on February 18, 2014.

Finally, Plaintiff alleged his hands healed poorly due to the lack of medical care.  ECF No. 1, p. 10.  At his hearing, he testified unidentified nursing staff told him he would have arthritis from his untreated fractures.  These allegations are contradicted by the record, which show Plaintiff entered custody at MCDC with arthritic changes in his hands from old healed fractures.  Plaintiff further failed to provide any objectively verifiable medical evidence showing that his hands had been fractured while in custody, that there was any lack of care for either hand, or that he had suffered any permanent injury as a result of the alleged denial of medical care to his hands.  Indeed, none of the x-ray reports from multiple x-rays taken in custody noted any new fractures.  At the same time, all x-ray reports noted old healed fractures, pins, plates, and prior surgery.  ECF No. 35-2, pp. 4-5, 9, 10-11.  The medical report from a free-world doctor provided to Nurse Brown on December 15, 2013, indicated Plaintiff complained of a broken wrist on June 14, 2013, but left without being seen.  ECF No. 39-3, p. 3.  The December 13, 2013, x-rays noted osteoarthritic changes in the right hand and erosive changes in the left hand.  ECF No. 35-2, pp. 4-5.  The x-ray reports from September 13, 2014, noted osteoarthritis in both hands from chronic healed fractures. ECF No. 35-2, pp. 10-11.  Plaintiff started received Mobic for arthritis pain on September 18, 2014. ECF No. 35-2, p. 12.  When asked directly if any medical professional, such as a doctor or nurse, told him he would have any permanent injury as a result of lack of treatment, Plaintiff testified he had "never really talked to the nurses about it."  Thus, Plaintiff has provided no verifying medical evidence of any permanent injury caused by the alleged denial of medical care. *See Laughlin v. Schriro,* 430 F.3d 927, 929 (8th Cir. 2005) (The objective seriousness of delay in treatment must be measured by reference to the effect of delay, which must be shown by verifying medical evidence in the record.)

Plaintiff therefore failed to provide any summary judgment facts or allegations which could

16

support a claim of deliberate indifference to serious medical needs against Nurse Emerson, either for injuries allegedly sustained to his hands during arrest, or for self-inflicted injuries while incarcerated. Because he could show no material fact in dispute as to either the objective or subjective prongs of the test for deliberate indifference to serious medical needs, Nurse Emerson is entitled to judgment as a matter of law.

## 4. CONCLUSION

For the reasons stated, I recommend that Defendants' Motions for Summary Judgment (ECF Nos. 34, 37) be **GRANTED** and Plaintiff's Complaint be dismissed with prejudice.

**The parties have fourteen days from receipt of the Report and Recommendation in which to file written objections pursuant to 28 U.S.C. § 636(b)(1). The failure to file timely objections may result in waiver of the right to appeal questions of fact. The parties are reminded that objections must be both timely and specific to trigger de novo review by the district court.**

**DATED this 30th day of January 2017.**

/s/ Barry A. Bryant
HON. BARRY A. BRYANT
UNITED STATES MAGISTRATE JUDGE